## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | **Crim. No. 03cr10298-NG** |
| ) | |
| EDWARD ENNIS, STEPHEN NICHOLSON, ) | |
| and JAMES SARDINA, ) | |
| Defendant. ) | |

GERTNER, D.J.

### AMENDED
### SENTENCING MEMORANDUM
### December 22, 2006

(This Memorandum replaces the original one issued on December 22, 2006, in that typographical errors in the text have been corrected.  The substances of the original Memorandum remains intact.)

    Seven defendants were indicted on various drug conspiracy and distribution charges.[1]  Their prosecution followed an elaborate two year federal investigation into drug trafficking on the South Shore of Massachusetts.  Some of the defendants were in their sixties, and one even in his seventies, with long criminal records.  All but one was sentenced to lengthy terms of ten, fifteen, and even twenty years, far, far higher than comparable sentences of only two decades ago.

    But however lengthy the term of imprisonment imposed, in some of these cases the sentence was *less* than the astonishing range suggested by the Federal Sentencing Guidelines.  This

---

[1] Count I charges all of the defendants with conspiracy to distribute and to possess with intent to distribute cocaine and marijuana in violation of 21 U.S.C. § 846. Counts II and III charge defendants Nicholson, Sardina and Taba with possession with intent to distribute and distribution of cocaine (Nicholson and Sardina) and heroin (Taba). Count IV charges defendant Edward Ennis ("Ennis") alone with felon in possession of a firearm in violation of 18 U.S.C. § 922(g). After the gun was suppressed on February 23, 2005 (see infra n. 3), the government represented that it would move to dismiss Count IV.

memorandum will address why in the sentencing of three defendants -- Edward Ennis, Stephen Nicholson and James Sardina. Specifically, it will deal with the treatment of defendants who qualify as "career offenders" under the United States Sentencing Guidelines ("Guidelines") after United States v. Booker, 543 U.S. 221 (2005).  Many courts, while announcing that the Guidelines are advisory, are in fact following them nearly as rigorously as they had before Booker.  Under the circumstances, it is especially important to spell out the legal limitations of the career offender guidelines in general, and in their application to these cases, in particular. Let me be clear: If I choose not to follow the career offender guidelines in the case of these defendants, it is not because I simply disagree with them and choose to substitute my own idiosyncratic philosophy of sentencing.  It is because the career offender guidelines as applied to the cases at bar are wholly inconsistent with the purposes of sentencing in 18 U.S.C. § 3553(a).

I will first describe the case in terms of the formalities of the indictment and the Guideline computations.  But a far more meaningful description focuses on defendants' respective roles in the conspiracy as those roles became apparent in these sentencing proceedings.  Who was the supplier of the drugs and thus the most culpable?  Who was next in the hierarchy?  Who was at the bottom?

Unfortunately, these questions are too often ignored in Guideline calculations.

Sentencing, even after the Supreme Court's decision in Booker, remains driven not by a defendant's actual role in a crime, but rather by two factors: 1) the quantities of drugs for which the government seeks to hold each defendant responsible and whether those quantities trigger a mandatory minimum sentence; and, 2) whether a defendant qualifies as a career offender under U.S. SENTENCING GUIDELINES MANUAL § 4B1.1 (2003)("U.S.S.G.").

Drug quantity may or may not be consistent with a defendant's actual role in the offense, and thus, with a defendant's culpability.  See, e.g., Paul J. Hofer & Mark H. Allenbaugh, The Reason Behind the Rules: Finding and Using The Philosophy of the Federal Sentencing Guidelines, 40 Am. Crim. Law Rev. 19, 70-72 (2003).  In some cases, the quantity of drugs the government would attribute to a defendant under U.S.S.G. § 2D1.1 is entirely fortuitous.  It correlates only with the happenstance of the timing of the government's surveillance, the drug transactions involving particular drug quantities they happened to see or hear.  At the same time, other indicia of role -- namely, the luxurious lifestyle of the defendant or its opposite, whether he or she has any lawful means of support, apart from drug dealing -- are devalued.  Thus, it is not at all unusual to find that a messenger who earns a only a small percentage of the

-3-

profits from a given drug transaction starts at the same offense
level as the dealer who stood to gain millions of dollars.[2]  And
since the Guideline drafters did not bother to describe the
reason for making quantity talismanic, the sentencing purposes
advanced by the quantity guideline, § 2D1.1, or what to do when
quantity-driven sentences are wholly at odds with any rational
sentencing scheme, judges were left "just to weigh the drugs and
mechanically compute the offense level."  Hofer & Allenbaugh,
supra at 72.  Happily, the Supreme Court's decision in Booker
mandates a different approach: Judges may not simply assume that
§ 2D1.1 advances the purposes of sentencing spelled out in 18

---

[2] While the Guidelines permit an adjustment for "role" in the offense,
those adjustments are often minimal - two or three points - and hardly offset
the substantial impact of quantity.  See Hofer & Allenbaugh, supra at 70-72.
As Hofer & Allenbaugh have noted:

> [C]ritics have complained that the Guidelines ignore
> important aspects of offenders' culpability. Minor
> members of a large-scale conspiracy can be held
> accountable for substantial amounts of drugs that they
> neither owned nor profited from.  Economic hardship,
> drug addiction, a history of physical or sexual abuse,
> or a lack of guidance as a youth -- for many, highly
> relevant to assessing an offender's culpability -- are
> ignored by the Guidelines and even actively
> discouraged as grounds for departure. In their concern
> to design a workable system and to minimize disparity,
> the original Commission clearly preferred objective
> factors, such as drug weight or dollar amount, to
> subjective ones, such as the offender's role or state
> of mind, which might be applied inconsistently.  The
> result, however, is that important moral questions of
> culpability are relatively neglected, while more
> easily quantifiable issues of harm are elevated to a
> significance and exactitude beyond their worth.  Even
> former Commissioners have noted that requiring judges
> to determine the exact amount of drugs or monetary
> loss involved in an offense gives the Guidelines a
> false precision.

Id. (Footnotes omitted).

U.S.C. § 3553(a).  Whether it does do so or not depends upon the circumstances of the individual case.  Moreover, the failure to consider those circumstances is not simply unfair; it may well be unconstitutional.

The second factor on which the sentences in this case are based, namely, the career offender guidelines, raises similar problems: If a defendant qualifies as a career offender (which, under § 4B1.1  means, <u>inter alia</u>, "two prior felony convictions of either a crime of violence or a controlled substance offense," broadly defined) and if the defendant is also guilty of distributing a quantity of drugs sufficient to trigger a mandatory minimum sentence, the combination of the two increases his sentence astronomically, often far beyond what his role in the offense or even his record alone may justify.  In fact, it is not at all uncommon to find, as in the instant case, that the supplier of drugs has a minimal criminal record, and thus, avoids career offender status, precisely because of his distance from street activities, while the street dealer winds up with a substantial one.

I.   **INTRODUCTION**

Sabarian Taba ("Taba"), Frederick Joseph Martineau ("Martineau"), Stephen Nicholson ("Nicholson"), James Sardina ("Sardina"), Edward Ennis ("Ennis"), John Soares ("Soares"), and Michael Malouf ("Malouf") were indicted for conspiracy to

distribute a quantity of cocaine, in violation of 21 U.S.C. § 846 and for the substantive distribution of cocaine and marijuana in violation of 21 U.S.C.  §§ 841(a)(1) and (b)(1)(A)(ii).[3]  A superceding indictment was brought against Taba, Nicholson, Sardinha, Ennis and Soares, specifying the specific drug quantities which the government sought to attribute to them. It was also accompanied by notice as to enhanced penalties under 21 U.S.C. § 841(b) (for the prior convictions of Taba, Martineau and Nicholson).[4]

A snapshot of the roles of the respective participants is as follows:

1.   Taba supplied cocaine and marijuana to Martineau.

2.   Martineau supplied Nicholson.

3.   Nicholson supplied Sardina and Malouf.

4.   Sardinha and Malouf sold to their respective customers.

5.   Ennis assisted Martineau; while his role was not fully developed on this record, it appeared to be something like a "gofer."

---

[3] Taba was also charged with the distribution of heroin. Ennis was charged with felon in possession of a firearm, a charge that will be dropped following my ruling on defendant's motion to suppress.  See Order Granting Ennis Mot. Supp., February 23, 2005.

[4] It should be noted that the litigation of these cases has taken more than the usual time because it has spanned the Supreme Court's changing sentencing jurisprudence in Blakely v. Washington, 542 U.S. 296 (2004) and Booker.

6.   Soares was a customer.

Everyone, except Taba, pled guilty to Count One, which alleged participation in a conspiracy involving 5 kilograms of cocaine or more.   Taba agreed to a jury-waived trial on all issues.[5]  I subsequently found him guilty as charged.

If I had strictly followed the Guidelines, as the government would have me do, the sentences of some of these defendants would not have remotely reflected their roles in the conspiracy, and thus, their culpability.   While in some cases the Guideline sentence was entirely reasonable and consistent with the 18 U.S.C. § 3553(a), in other cases, it was not at all.

**Taba:**      Taba, age 54**,** appropriately received the most severe sentence, 240 months.   He was held responsible both personally and as a member of a conspiracy for 5 kilograms or more of cocaine, a quantity which triggered a mandatory minimum sentence of ten years to life, under the first tier of the statute, 21 U.S.C. § 841(b)(1)(A).[6]  With an enhancement for a

_____

[5] I followed the procedure I had outlined in United States v. Malouf, 377 F. Supp. 2d 315 (D.Mass. 2005), for a jury-waived trial on the issue of the quantity for which each defendant was accountable, using a "beyond a reasonable doubt standard." On October 13, 2006, however, the First Circuit reversed Malouf, holding that the traditional sentencing standard, "a fair preponderance of the evidence," not "beyond a reasonable doubt," was to be applied. 466 F. 3d 21 (1st Cir. 2006). The defendant has indicated that he intends to seek certiorari.  The reversal of Malouf, however, does not have an impact on these sentencings. The factfindings I made would have been the same regardless of the standard.

[6] The statute, 21 U.S.C.§ 841(b), consists of three relevant subsections, each containing a sentencing range.  Beginning with the most severe, what I call the "first tier," § 841(b)(1)(A) imposes a mandatory

prior conviction for drugs, the mandatory minimum rose to 20 years to life.  Since Taba's record was relatively minimal (Criminal History II), the quantity wholly attributable to him drove the sentence.  He received a 240 month sentence with ten years of supervised release.

**Martineau:**     Martineau, age 79 at the time of sentencing, pled guilty to a conspiracy involving 5 kilograms or more of cocaine under the first tier of the statute, § 841(b)(1)(A). However, he was held personally responsible for between 2,000 and 3,000 grams of cocaine, which placed him in the second tier under § 841(b)(1)(B) (more than 500 grams but less that 5 kilograms). (The mandatory minimum sentence is triggered by the amount for which he was personally responsible, not the conspiracy amount. United States v. Colon-Solis, 354 F. 3d 101 (1st Cir. 2004).) With an additional enhancement for a prior felony conviction, his sentencing range was a mandatory minimum of ten years to life.

---

minimum sentence of ten years and a maximum sentence of life when the offense involves five kilograms or more of a substance containing cocaine.  The minimum sentence is increased to twenty years "if death or serious bodily injury results" or if the defendant has a previous felony drug conviction. The second tier, § 841(b)(1)(B), imposes a mandatory minimum sentence of five years and a maximum of forty years if the offense involves 500 grams or more of a substance containing cocaine.  Again, death or serious bodily injury increases the mandatory minimum sentence to twenty years, and a previous felony drug conviction increases it to ten years.  Finally, the third tier, § 841(b)(1)(C), is the catchall provision that imposes a maximum sentence of twenty years and no minimum sentence for any quantity under 500 grams.  The maximum is increased to thirty years with a prior felony drug conviction and the minimum is set at twenty years and the maximum at life, if death or serious bodily injury results.

Like Taba, Martineau's criminal history score was relatively low, at a level II.  This was the case, notwithstanding the fact that he had a murder conviction for which he had received the death penalty, later reduced to a sentence of life imprisonment from which he was paroled.  Significantly, the criminal history guidelines, in their "scoring" of a defendant's record, do not distinguish between crimes of violence and other offenses.[7]

The Guideline sentence, again driven by quantity, would have been at a level 28, or 25 with "acceptance of responsibility," for a range of 63-78 months.  The mandatory minimum, however, trumped all Guidelines calculations.  Accordingly, I sentenced Martineau to 120 months in prison and 8 years' supervised release.

**Nicholson:**    Like Taba and Martineau, Nicholson (age 65) pled guilty to a conspiracy involving 5 kilograms or more of cocaine.  While he vigorously contested the amount for which he was to be held personally responsible, after several days of hearings, I attributed 644 grams of cocaine to him, putting him in the second tier of § 841 (b)(1)(B), like Martineau.

---

[7] See United States v. Leviner, 31 F. Supp. 2d 23, 33 (D. Mass. 1998)("To treat this man [Leviner] as if he were only a point on a grid . . . would do violence to the purposes of the Sentencing Guidelines. It would treat someone convicted of Felon in Possession of a Firearm [the defendant's conviction] with a minor record, solely because he had a few sentences in the criminal history (1),(2), and (3) range, the same as someone with multiple, violent crimes, and multiple ten to fifteen year sentences. It would create a new form of disparity, treating offenders that are completely different in a like way."

Significantly, that amount reasonably reflected Nicholson's role in the conspiracy: It was more than that for which Malouf was responsible but less than that for Martineau or Taba.

Nicholson's criminal record, however, *both* raised the statutory mandatory minimum, and made him eligible for career offender status.  The combination of the two, according to the calculations of the government and the Probation Office, led to an extraordinary range of 262 to 327 months, or over twenty years.  This range was double that of his *supplier*, Martineau, and 20 months more than that of his *supplier's supplier*, Taba. As I describe below, I concluded that such a sentence was not remotely reasonable in the light of Nicholson's record, the sentences of codefendants, the crimes for which other defendants are sentenced to 20 years, and Nicholson's age, 65.  I departed downward to a sentence of 151 months, not an insubstantial sentence, but one far more proportionate to the sentences of codefendants.

**Sardina**:  Sardina (age 70) pled guilty to the same conspiracy, the distribution of cocaine over 5 kilograms or more. He was held responsible, however, for a relatively small amount of drugs, 55.59 grams (between 50 and 100 grams of cocaine), for which there was no mandatory minimum.  But like Nicholson, he was a career offender, a status which raised his sentence to 262 to 327 months, a sentence higher than Taba's or Martineau's, who

-10-

were higher than he was in the conspiracy.  I departed downward
to 84 months for the reasons described below.  Sardina's
sentence was intended to enhance the sentence he would have
received under the Guidelines but for his career offender status,
but not reach what I believed to be a level wholly inconsistent
with 18 U.S.C. § 3553(a).

**Malouf:**  Malouf, age 40, who was similarly situated to
Sardina, received 60 months in prison, and six years supervised
release.  His sentence was recently reversed on procedural
grounds.  See supra n. 5.

**Ennis:**  Ennis (age 68) was held responsible for 198.45
grams of cocaine.  That quantity, however, clearly did not
reflect Ennis' role in the case.  The government acknowledged
that Ennis was, in effect, Martineau's assistant, but,
unfortunately, the government had no information about the extent
to which Ennis profited by his relationship to Martineau, what he
earned per shipment, or how that compared with the profit
Martineau was making.  Indeed, from the evidence presented in
Ennis' motion to suppress, his living arrangements – sharing a
small house with his youngest daughter and her family –  were
modest, hardly befitting a major drug dealer.  In any event, it
made no sense to hold Ennis responsible for the same quantity as
Martineau when his role with respect to that quantity was
different.

-11-

To be sure, Ennis, like Nicholson and Sardina, was a career offender; the guideline range, again, would have been 262 to 327 months (with a criminal history of VI and an offense level of 34), double the sentence of Martineau, the man for whom Ennis worked.  I departed downward, sentencing Ennis to 100 months' imprisonment and six years' supervised release for the reasons I describe below.

**Soares:**  Soares was the least culpable of all; he was a customer.  He received a sentence of 24 months in prison and 6 years of supervised release. The government did not appeal.

## II.  CAREER OFFENDER PROVISIONS AND THEIR LIMITATIONS

### A.   Career Offender Provisions and Recidivism

The sentences of Nicholson, Sardina and Ennis were driven by the career offender enhancement of the Guidelines, § 4B1.1. Long before United States v. Booker, the Sentencing Commission, recognizing the inadequacies of the criminal history scoring system, encouraged departures where "reliable information" indicated that the criminal history category "significantly over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit further crimes." U.S.S.G. § 4A1.3(a)(1).  See United States v. Woodley, 344

F.Supp. 2d 274, 277 (D. Mass. 2004).[8]  Moreover, this departure

is also available to individuals who otherwise qualify for career

offender status.  United States v. Lacy, 99 F. Supp. 2d 108, 120

(D. Mass. 2000).  In a state without sentencing guidelines, like

Massachusetts, it is not surprising that criminal history

departures would be invoked with some regularity.[9]  Indeed,

departures in the career offender category were common country-

wide, long before the Booker decision.[10]

Reports of the United States Sentencing Commission

underscore why criminal history departures were frequent for

---

[8] As Judge Adelman noted in United States v. Hammond, 240 F.Supp. 2d
872, 876 (E.D. Wis. 2003):

> This is so because the Commission has recognized the
> inherent limitations in the mathematical approach to
> criminal history it has adopted.  See U.S.S.G. § 4A.
> 1.3 (background commentary)('[T]he criminal history
> score is unlikely to take into account all the
> variations in the seriousness of criminal history that
> may occur.') . . . Therefore, the Commission has
> provided district courts with the specific authority
> to make 'adjustments' in the criminal history category
> based only on 'reliable information.' The information
> need not be sufficient to take the case out of the
> 'heartland' of cases – only 'reliable'– and indicative
> of either (1) a significant over-representation of the
> seriousness of the defendant's criminal history or 2)
> the likelihood that the defendant will commit further
> crimes.  U.S.S.G. § 4A1.3(b)(l).

(Footnotes omitted).

[9] Put simply, the issue is how to translate Massachusetts sentences into
the rigid categories of the Guidelines' criminal history provisions.

[10] See Michael S. Gelacak, Ilene H. Nagel and Barry L. Johnson,
Departures Under the Federal Sentencing Guidelines: An Empirical and
Jurisprudential Analysis, 81 Minn. L.Rev. 299, 356 (December 1996)(noting the
"extensive use of departures from sentences generated by career offender
provisions.").  Moreover, because the career offender provisions require a
sentence at or near the maximum term authorized, the resulting departures were
often quite substantial. Id. at 357.

career offenders.  In its 2004 report, United States Sentencing
Commission, <u>Measuring Recidivism: The Criminal History
Computation of the Federal Sentencing Guidelines</u> (May 2004), the
Commission noted that there was no significant difference in
predicting recidivism between criminal history V, and criminal
history VI.  The Commission concluded that this was so in part
because the career offender guideline was over-inclusive.  Career
offenders, for example, can be assigned to criminal history VI
even if they have fewer than 13 criminal history points, the
minimum number of points otherwise needed for a criminal history
VI label.  Or they can be put in that category for relatively
minor offenses that are considered a felony in one state, but a
misdemeanor elsewhere in the country.[11]

Clearly, this is an area that invites particular scrutiny
post <u>Booker</u>, when the guidelines, including the career offender
guidelines, are supposed to be advisory.  <u>See</u> <u>e.g.</u> <u>United States
v. MacKinnon</u>, 401 F. 3d 8 (1st Cir. 2005)(remanding for re-
sentencing after <u>Booker</u> a sentence of over 20 years for the
distribution of 5 grams of cocaine, based on the interaction of
the mandatory minimums of 21 U.S.C. § 841, and the career
offender provisions of the Guidelines.)

---

[11] Thus, for example, assault and battery is a misdemeanor in the
overwhelming majority of states.  In Massachusetts, it is a felony.  M.G.L. c.
265 § 13A.  As a result, more Massachusetts offenders convicted of this – and
another qualifying offense – may be put in the career offender category than
elsewhere.

**B.    Application Issues**

Sardina argued that under U.S.S.G. § 4B1.1(b), the "statutory maximum" on which the enhanced career offender sentence ought to be based should not be the amounts of controlled substance involved in the conspiracy as a whole, but rather the amounts for which Sardina is personally responsible under § 1B1.3.  If the measure for the career offender sentence under § 4B1.1(b) is the conspiracy amount, then the corresponding maximum penalty under 21 U.S.C. §  841(b)(1)(A)(ii) would be life imprisonment and an initial offense level 37 (pursuant to guideline § 4B1.1(b)(A)). If, on the other hand, the measure is Sardina's accountability under § 1B1.3 for just over 50 grams, the range would be the range in the third tier of § 841 (b)(1)(C), with a prior drug felony conviction, or a term of not more than thirty years. This approach produces an initial offense level of 34 (pursuant to guideline § 4B1.1(b)(B)).

In the period before Apprendi v. New Jersey, 530 U.S. 466 (2000), Sardina argues, the government was not required to prove either drug quantity or the type of drug involved in the charged conspiracy.  All that was required was proof of a conspiracy involving a detectable amount of some controlled substance.  The application of the § 841(b) penalties, requiring the identification of the drugs involved and the quantities, was left to the district court at sentencing.  According to Sardina, if

-15-

the offense levels under § 4B1.1 were intended to be based in conspiracy cases on the amounts involved in the conspiracy as a whole rather than on the amounts attributed to the individual conspirators under § 1B1.3, the Commission should have said so clearly. Moreover, if quantity is a sentencing factor for one set of purposes, i.e. the mandatory minimum, it should arguably be the same measure for another set of purposes, i.e. the career offender provision.[12]

If the guideline is based on the statutory maximum for conspiracy, as the government argues, then there is a problem of over-inclusiveness. A § 4B1.1 offense level calculation that is based on conspiracy-wide quantities equates the career offender distributor of a few grams of cocaine who is charged as a conspirator with the career offender distributor charged substantively with up to 150 kilograms of cocaine or with a career offender conspirator responsible for up to 150 kilograms of cocaine. Similarly, the career offender who is charged only with substantive distribution of a small amount of cocaine is treated far more favorably than a career offender who is at the tail end of a conspiratorial chain but whose relevant conduct calculation under § 1B1.3 is the same small amount of cocaine.

---

[12] Nor does 28 U.S.C. § 994(h), which authorizes the Commission to write career offender guidelines, resolve the issue. Section 994 states only that the "guidelines specify a sentence to a term of imprisonment at or near the maximum term authorized" for certain categories of defendants.

There are, in short, career offenders and *career offenders*. Treating offenders who are not equally culpable the same is a false equality, not at all consistent with the admonition "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

Nevertheless, I need not resolve Sardina's challenge on this record.  So long as the Guidelines are advisory, I can take the issues raised here into account in determining whether to follow the career offender guideline, whether to depart or vary from it, and by how much.  I turn to that analysis next.

### III. <u>THE DEFENDANTS</u>

In the case of each of the following defendants -- Nicholson, Sardina, and Ennis -- I departed downward from the career offender ranges for the following reasons:

**Nicholson:**    Nicholson's Guideline offense score, for 644 grams, would have been 26, or 23, minus three for acceptance of responsibility under § 3E1.1 (the same range as Malouf, who was less culpable).  Since his criminal history score was IV, without a career offender enhancement, his sentencing range would have been 70 to 87 months.

But for Nicholson, unlike Taba or Martineau, the same conviction which enhanced his range under the statutory mandatory

minimum (putting him in the second tier of §  841(b)(1)(B)), was counted again to qualify him for the career offender enhancement. This, however, according to the Supreme Court in the years before Booker, is not impermissible "double counting."  United States v. LaBonte, 520 U.S. 751 (1997). With both the career offender enhancement and the enhancement for a prior conviction, Nicholson's sentencing range is 262 to 327 months.

The Introduction to the Guidelines notes that a primary purpose of the Guidelines, and indeed, a significant purpose of all sentencing, is not just to avoid disparity in the sentencing of offenders, but also to ensure "proportionality in sentencing through a system that imposes appropriately different sentences for criminal conduct of different severity."  U.S.S.G. § 1A1.1, Introductory cmt. (n.3).  The drafters could have avoided disparity by sentencing all offenders to life imprisonment no matter what they did.  But while that would have made sentencing uniform across the country, it would have been uniformly disproportionate, not to mention grotesquely unfair.

In the instant case, Nicholson is facing 20 years for drug distribution, a sentence which matches the maximum punishment for the following offenses:  Sexual abuse, 18 U.S.C. §  2242; sexual exploitation of children, 18 U.S.C. § 2251; enticement into slavery, 18 U.S.C. § 1583; terrorism, 18 U.S.C. § 2322; torture, 18 U.S.C. § 1340A; kidnapping, 18 U.S.C. § 1201; seditious

conspiracy, 18 U.S.C. § 2384; and, biological weapons, 18 U.S.C. § 175c.  Likewise, under the Guidelines, selling someone in the slave trade is "only" an offense level 22, U.S.S.G. § 2H4.1 and transmitting top secret national defense information is "just" a 29, U.S.S.G. § 2M3.3, while Nicholson's base offense level is 34.

Even an analysis of Nicholson's role vis a vis others in this conspiracy suggests that this sentence is vastly disproportionate.  As I noted above, Nicholson's guideline range is double that of his supplier, Martineau, and 20 months more than that of his supplier's supplier, Taba.

To be sure, Nicholson's record suggests that he is the very prototype of a career offender:  There are multiple offenses, sprinkled with multiple imprisonments and no indication that he has ever worked at anything but drug dealing.  But while some enhancement for his career offender status is entirely appropriate, the question is how much, given the reality of his role and his age.  For Nicholson, the Guideline range for which the government argues is effectively a life sentence.  He is 65; he has had two heart attacks, in 1990 and 1997.

Accordingly, I depart to a criminal history V (one level) and offense level 30 (four levels) for a range of 151 to 188 months.  I sentence Nicholson to 151 months.  That sentence reflects an enhancement appropriate to Nicholson's career

offender status.  At the same time, it represents a sentence
higher than that of Martineau but less than Taba.

**Sardina**:  As described above, Sardina, who purchased drugs
from Nicholson and sold to his customers, was held responsible
for a relatively small amount of drugs.  Without the career
offender enhancement, and with a criminal history of IV, his
guideline range would have been only 24 to 30 months.

The career offender enhancement raises both axes, the
criminal history axis to VI and the offense level axis to 37,
with a reduction to 34 for acceptance of responsibility.  The
sentencing range is thus 262 to 327 months imprisonment, more
than ten times the range that would otherwise be applied, and as
I have noted, higher than Sardina's supplier and 20 months higher
than his supplier's supplier.

Although Sardina is a career offender, his record is
unusual, not at all like Nicholson's.  He had no record until he
was 44, before which he had a job and a family.  It was only
after a series of tragic events that Sardina's life disintegrated
– a divorce, the death of two children, the incarceration of a
third child.

Given his precarious health and age (69), the Guideline
range, 262 to 327 months, may well be a death sentence.  Sardina
has  chronic lymphocytic leukemia that is complicated by

neuropathy.  He has received chemotherapy twice in the past for his leukemia; his neuropathy, a progressive illness, requires that he receive intravenous treatments of gamma globulin (a six-hour blood transfusion) every three weeks.  If he does not receive the blood transfusions, he would be unable to walk.  He has Adult Onset (type-2) Diabetes Mellitus, which is controlled with oral insulin but has worsened over the last few years, coupled with high blood pressure. X-rays taken a few months ago reveal heart muscle damage.

From a base offense of 34 and criminal history of VI, I departed to a criminal history of IV and base offense of 25.  (If I had agreed with the defendant, that the career offender guideline should be based on the amount attributable to him individually, the base offense level would have been 31.)  The resulting guideline range was 84 to 105 months. I sentenced Sardina to 84 months.

The defendant requested a sentence of 60 months, the minimum mandatory sentence.  I rejected that request to give deference to Sardina's career offender status, which distinguished him from Malouf, an offender whose role was similar to Sardina's.

**Ennis:**    In Ennis' case, the difference between the Guideline range and the career offender range is particularly significant.  Without the career offender enhancement, Ennis' offense level would be 15 and a criminal history of VI for a

range of 41 to 51 months.  The career offender provisions, which increased his range to 34 and VI, placed him at the 262 to 327 range, higher than Martineau, the man for whom he worked.

This was a result which made no sense under 18 U.S.C. § 3553(a).  Information presented at sentencing suggested that Ennis was Martineau's assistant.  While the government could not identify how much he stood to make with each drug transaction, it is clear that he was a piece worker.  For example: During one transaction, Martineau reports to Nicholson that he would send "Eddie" (meaning Ennis) to bring the money.  During another transaction, Ennis transmitted messages from potential customers to Martineau, and "got the drugs" ready at Martineau's direction. While he met Soares in prison, and represented he could get drugs for Soares, in fact he referred Soares to Martineau; shortly thereafter, Soares contacted Martineau directly.

Moreover, Ennis is 68 years old and has heart disease.  A twenty-year sentence is not merely inconsistent with the statutory purposes of sentencing.  It too is wildly disproportionate to his role in this offense and to the sentences of other codefendants.

## IV.  <u>CONCLUSION</u>

There are times when every judge tallies up the Guideline numbers, arrives at a range, and concludes that the result makes

-22-

absolutely no sense.  That is the case here.  The Guideline results – driven by the career offender guidelines and the quantities – make no sense in terms of the purposes of punishment, especially, specific deterrence, incapacitation, and just punishment.  Given the ages of some of these defendants, these are life sentences.

Nor do the Guideline results reflect the requirement that sentences be proportionate "for criminal conduct of different severity."   U.S.S.G. § 1A1.1.  Finally, the results required by the Guidelines make absolutely no sense in terms of the requirement that there be no "unwarranted" disparity as between defendants "with similar records who have been found guilty of similar criminal conduct."  28 U.S.C. § 991(b)(1)(B).  There are real differences between the conduct of these defendants.  To the extent that there are commensurate differences in their sentences, those differences, by any rational, not to mention just measure, are "warranted."

In the final analysis, the sentences I have imposed, even though lower than the astonishing ranges required by the Guidelines, are severe.  They are driven by mandatory sentences which, although widely criticized, I am obliged to impose.

**SO ORDERED.**

**Date:  December 22, 2006**      /s/Nancy Gertner
                                 **NANCY GERTNER, U.S.D.C.**